Filed 1/10/22  P. v. Dintelman CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D078065 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SWF1907769) |
| DONOVAN DINTELMAN, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Riverside, Kelly L. Hansen, Judge.  Affirmed and remanded with directions.

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Donovan Dintelman of five counts of robbery (Pen. Code, § 211[1]) and six counts of burglary (§ 459) stemming from a string of bank robberies throughout Riverside County. On appeal, Dintelman challenges all of the convictions, asserting that because no eyewitness unequivocally identified him as the perpetrator in any of the five incidents, insufficient evidence supported the jury's findings of guilt. Dintelman also contends the trial court erred by instructing the jury with the "witness certainty" factor contained in CALCRIM No. 315. We reject these arguments.

After briefing was completed, the Legislature enacted changes to section 654 giving the trial court new sentencing discretion to choose which penalty to impose when a defendant is convicted under two different statutory provisions for the same act. Prior to the change, the trial court was required to impose the sentence under the provision carrying the longest term of punishment. As a result of the change, Dintelman submitted a request to file a supplemental brief asserting remand is necessary to provide the trial court with the opportunity to exercise its discretion under the new law.

We granted the request and provided the Attorney General with the opportunity to submit a supplemental response. The Attorney General concedes the changed law applies to Dintelman and remand for resentencing is appropriate. We agree with the parties and therefore remand for the limited purpose of allowing the trial court to exercise its new discretion. The judgment is otherwise affirmed.

---

[1] Subsequent undesignated statutory references are to the Penal Code.

FACTUAL AND PROCEDURAL BACKGROUND

*A. Prosecution's Case*

Around 11:25 a.m. on June 12, 2019, Elizabeth P. was working as a teller at a U.S. Bank inside an Albertson's grocery store in Murrieta. At that time, a man wearing a surgical mask and a hooded jacket approached Elizabeth's desk and gave her a manila envelope with writing on it. The man demanded she fill the envelope and told her he had a gun. The envelope said to fill it with "hundreds and fifties … no fake money or dye," and that the man had a gun. Elizabeth, fearing for her life, filled the envelope with fifty and hundred dollar bills and then pressed the silent alarm at her station. The man left the bank with the stolen cash.

Elizabeth was interviewed by police shortly after the robbery and tried to describe the man, even though his face was obscured by the surgical mask and hoodie. She thought he was short, she estimated his height to be somewhere between five feet four inches and five feet seven inches, and that he had light eyes. A video of the robbery from the store's surveillance system was played for the jury while Elizabeth was on the witness stand. The video matched her description of the encounter and showed the man was wearing a surgical mask, "a grayish hoodie," and a baseball cap under the hood with an emblem or sticker on it. The hoodie also had a zigzag pattern on it.

Elizabeth was shown a picture of Dintelman during her testimony. She stated that the size, shape, and color of Dintelman's eyes, the shape of his hands, and his skin tone all matched her recollection of the robber's features. She testified that Dintelman was about the same size as the man who robbed her. She also testified that photos of masks found in Dintelman's home were similar to the one worn by the robber.

3

Around 11:40 a.m. on June 14, 2019, Travis I. was working as a teller at a U.S. Bank inside an Albertson's in Wildomar. Like the June 12th robbery, a man approached Travis's station wearing a hoodie, a baseball cap with an emblem on it, and a surgical mask. The man gave Travis a manila envelope with directions written on it. The envelope instructed the teller to fill it with "fifties" and "large" bills, and "no bait" or "dye," and said the man was armed. Travis did not have a large amount of cash in his till drawer because the bank had been alerted to the robbery in Murrieta. Travis filled the envelope with all the fifty and hundred dollar bills he had. The man was upset because it wasn't a lot of money. Travis showed him the cash drawer, and the man told Travis to put the rest of the bills in it into the envelope. He complied and the man left the store. Travis pulled the silent alarm and called security.

While Travis was on the witness stand, the jury was shown the video of the robbery taken by the store's surveillance system. The video matched Travis's description of the encounter. Travis also testified that Dintelman was similar in height, body, and skin tone to the man that robbed him. He stated that a photograph of Dintelman showed that his hands, nose, and eyes were similar to the robber's. Finally, Travis testified that a photograph of a surgical mask collected from Dintelman's home was similar to the one worn by the robber.

The third charged robbery occurred on June 19, 2019 at a Chase Bank located inside a Stater Brothers supermarket in Lake Elsinore. That day, around 9:15 a.m., a man approached a teller, Daisy N., with a manila envelope that had a note written on it. As in the prior robberies, the man wore a surgical mask that Daisy testified was similar to the masks found in Dintelman's home.

4

When he reached the teller station, the man put the envelope on the counter.  The note on the envelope said, "give me hundreds, fifties, twenties, no dye packs" and "no fake bills."  Daisy, fearing for her safety, filled the envelope with about $1,200.  When the man saw the cash, he demanded more money from her second drawer.  Daisy opened the second drawer and showed him it was empty.  The man then took the envelope and left the store.  Video surveillance footage from the store confirmed Daisy's recollection of events.

Daisy also testified that the man was wearing a baseball hat with a round sticker on the brim and a dark sweatshirt with a design on it.  The man had the hood of his sweatshirt pulled over the hat.  Daisy testified that the man was white, about five foot five inches tall, and had green eyes.  She also testified that the robber had the same stature as Dintelman and that Dintelman's eyes looked "the same" as the robber's eyes.  Daisy testified the eyes had the same shape and wrinkles as Dintelman's eyes.

The fourth charged robbery followed the same pattern as the earlier three.  On June 22, 2019, around 10:30 a.m. a man in a surgical mask approached the teller station of Dakota S. in the U.S. Bank located inside a Ralph's grocery store in Murrieta.  The man was dressed in a dark grey sweatshirt with a skull design, a hat with a round sticker on the brim, and the hood of the sweatshirt pulled over the hat.  The teller testified the man was white, was about five foot six or seven inches tall, and had bright blue-green eyes.  She was unwavering in her certainty about the color of the robber's eyes.  Like the other victims, Dakota testified the surgical mask looked like the ones in a photograph of the masks later discovered in Dintelman's house.  Dakota also testified that the hat worn by the man looked like a hat recovered from Dintelman's truck after his arrest.

5

Once the man reached the teller station, he gave Dakota a wrinkled manila envelope that said, "I have arrived!!  Give me all your hundreds and fifties, no dye packs or anything like that."  Dakota, fearing for her life, put the single $50 bill she had into the envelope.  The man was not satisfied and demanded she hand over all the money in her drawer.  The teller complied, then the man demanded the money from her "other drawer."

Dakota responded she did not have another drawer and asked a co-worker standing nearby, Crystal B., to put the money from her teller drawer in the envelope.  Dakota handed the envelope to Crystal and pulled the silent alarm at her station.  Crystal, also fearing for her safety, filled the envelope with cash and handed the envelope back to the man.  The man left, with approximately $2,200 in cash, and Dakota yelled to a grocery store cashier to call 9-1-1.  Crystal testified the man was not tall and, like the other witnesses that testified, said the man had light-colored, not brown, eyes.

Almost five months later, on November 15, 2019, at around 9:40 a.m. a second robbery occurred at the Chase bank inside the Stater Brothers store in Lake Elsinore.  That day, Brittany C. was working as a teller.  A man approached her station wearing a beanie and a surgical mask.  The man's hands were ashy, and Brittany thought there might have been powder or some other substance on them.  The man handed the teller a folded envelope with writing on it, said "Do you know what is happening," and lifted his sweatshirt to reveal the top of a gun in his belt.  Brittany testified there was "scattered" writing on the envelope that said, "fifties and hundreds" and something like "no dye packs."  The teller, fearing her safety, grabbed fifty and hundred dollar bills from her drawer (totaling $4,200) and tried to hand them to the man.  He told her to put the bills in the envelope.  Brittany complied and handed the envelope to the robber, who then turned and left.

6

Like the other victims, Brittany testified that the mask the man wore was the same as the one in photographs taken of the masks later discovered in Dintelman's house. She thought the robber was about five foot five inches tall and testified Dintelman appeared to be the same height as the man that robbed her. Video surveillance footage was played during Brittany's testimony showing the events she described. Brittany also told the jury the portion of the gun the man showed her during the robbery looked like a BB gun that was later discovered by police at Dintelman's home.

The prosecution also presented evidence of two failed robberies. The first took place on June 12, 2019 at a U.S. Bank in an Albertson's in Wildomar, the same bank that was robbed two days later. Sometime between 10:00 and 11:00 a.m., a man wearing a grey sweatshirt with the hood up, a baseball hat, and a blue surgical mask approached a teller with a folded manila envelope in his back pocket. A cashier who witnessed the man testified the mask was the same color as that later found in Dintelman's house. Before reaching the teller station, the man paced back and forth. When no one was able to assist him right away, he left the store. Photographs taken by the video surveillance system of the man were shown to the jury.

The second failed attempt took place on June 18, 2019. That day a man approached the teller counter at a U.S. Bank inside an Albertson's in the City of Orange. The teller testified the man was about five foot six inches tall and was carrying a manila envelope. The man was wearing a beanie, a hooded sweatshirt, and a surgical mask like that later discovered in Dintelman's home. The teller was aware of the recent robberies in the area by a man fitting this description. Before the man reached the teller's station, she went to her branch manager's office, and the manager immediately called the

police. The jury was shown photographs and video from the store's surveillance system of the incident.

On November 20, 2019, around 10:15 a.m., a customer at an Albertson's in Chino Hills alerted the store manager of a suspicious man in the liquor aisle. The manager, David R., headed toward the liquor section and saw a man dressed in black and wearing a surgical mask walk past him towards the bank at the front of the store.[2] As the manager followed the man outside, he overheard a bank employee who was on the telephone say the word "rob." David followed the man from a distance out of the store and watched him get into a white truck parked in the fire lane. David used his cell phone camera to take pictures of the truck, a Toyota Tacoma, and its license plate. The manager went inside and spoke to the bank employee who had been on the phone with the police. Thereafter, David viewed the store's video surveillance and then turned it and the photos he had taken over to police.

An investigator with the Riverside County Sheriff's Department used the photographs provided by the store manager to determine the Tacoma was rented by Dintelman on November 12th, then returned to the rental company on November 14th, and then rented again by Dintelman on November 15th.[3] Once Dintelman was identified, the Sheriff's Department staked out his residence in Lake Elsinore, where they found the Tacoma parked in the

---

[2]    During his testimony, David stated the man he had followed was wearing jeans, construction boots, a black jacket, a hat, and surgical mask like the one in the photo of the masks found in Dintelman's home.

[3]    An employee of the rental company testified that the truck was not returned again and on November 22, 2019 the company was notified the truck was at the police station.

driveway. Shortly after the police arrived at the residence, Dintelman got into the truck and began to drive away but soon realized he was being followed by an unmarked car. Dintelman pulled into a driveway and was arrested as the suspect in the string of unsolved robberies.

Dintelman was taken to the sheriff's station without changing clothes. He was wearing a gray and black colored beanie, a black sweatshirt, and tan boots. The investigator testified that the boots appeared to be the same boots the robber was wearing during the crimes on November 15, 2019 based on a visible tag on the right boot. The investigator also stated the position of the drawstrings of the hoodie Dintelman was wearing when he was arrested looked similar to the photos and video of the robbery on November 15, 2019.

Police located another truck that belonged to Dintelman, a Dodge Ram. Inside, investigators found a black hat that said "Savage" and had a round sticker on the bill, along with a torn piece of a manila envelope. Investigators also searched Dintelman's home, where he lived with two other people. Inside Dintelman's room, police found two blue surgical masks at the bottom of a trashcan. They also discovered a black BB gun inside a laundry basket in his room. A receipt found in a dresser drawer showed the BB gun was purchased on June 16, 2019.

A cell phone analyst employed by the Riverside Sheriff's Department testified for the prosecution. The analyst explained that a phone in use will ping the nearest cell phone tower within a three mile radius. She produced a map showing the location of the cell phone towers that Dintelman's phone pinged throughout the time frame of the robberies, and placing him near most of the incidents at the correct time. The analyst showed that Dintelman's phone was near the Albertson's parking lot on June 12, 2019 at 10:19 a.m., the site and time of the first failed robbery attempt. Next, the

9

phone was in the vicinity of the second charged robbery on June 14, 2019 at 11:53 a.m.  A cell phone ping placed Dintelman near or on the 241 and 261 toll roads in Orange County in the vicinity of the Albertson's in the City of Orange at 2:15 p.m. on June 18, 2019.  The data showed Dintelman's phone was near or on Interstate 15 in the vicinity of Chase Bank in the Stater Brothers in Lake Elsinore between 8:58 and 9:15 a.m. on June 19, 2019  The phone was adjacent to Interstate 15 between Lake Elsinore and Wildomar, about 10 minutes away from the same bank around the time it was robbed again on November 15, 2019.  Finally, the data showed the phone near the parking lot of Albertson's in Chino Hills where David photographed the Toyota Tacoma at 10:06 a.m. on November 20, 2019.[4]

*B. Defense Evidence*

Dintelman's former roommate, who suffered from a terminal illness and was cared for by Dintelman during the time they lived together, testified on his behalf.  The roommate testified that Dintelman was his paid caregiver and Dintelman treated him well.  He also said he kept a few surgical masks in the home.  The roommate said that Dintelman usually wore work clothes that had concrete on them and did not recognize the clothing worn by the robber.  He also told the jury that Dintelman often took in homeless people and helped them get on their feet, providing them with a place to stay and food, and buying them a phone.

*C. Verdict & Sentencing*

At the conclusion of the trial, the jury found Dintelman guilty of all counts, six violations of section 211 and five violations of section 459.  At the

---

[4] The analyst testified she found no data connecting Dintelman's phone to the June 12 or June 22 robberies in Murrieta.  She explained the lack of data did not mean the phone was not there; rather, it showed only that no calls occurred or the phone was turned off.

sentencing hearing, Dintelman admitted a charged prior serious felony offense (§ 667, subd. (a)) and prior strike offense (§ 667, subds. (c) and (e)(1)). The court imposed a total sentence of 21 years in state prison, consisting of a three-year term on the first count (§ 211) doubled to six years, consecutive one-year terms on each of the five additional convictions under section 211 doubled to two years each, and a consecutive five-year term for the prior serious felony. Pursuant to section 654, the court imposed and stayed terms on the five burglary convictions under section 459.

## DISCUSSION

### I

Dintelman first asserts that none of the convictions are supported by sufficient evidence because there was no eyewitness testimony confirming his identity as the robber. The Attorney General responds that substantial evidence supported "the convictions because there was overwhelming evidence that the same man committed all of the crimes, and strong partial identification and circumstantial evidence that [Dintelman] was that man."

### A

" 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial

11

evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]'" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

"The standard of review is the same in cases in which the prosecution relies on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt." ' [Citation.] Accordingly, we must affirm the judgment if the circumstances reasonably justify the jury's finding of guilt regardless of whether we believe the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Kerley* (2018) 23 Cal.App.5th 513, 529; see also *People v. Streeter* (2012) 54 Cal.4th 205, 241 [" 'An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise.' "].)

Under this standard of review, it is not required that the identification of the defendant be certain. (*People v. Yates* (1958) 165 Cal.App.2d 489, 494.) Rather, "[t]estimony that a defendant 'resembles' the robber [citation] or 'looks like' the same man [citation] has been held sufficient." (*Ibid.*) "Positive identification free from doubt, often difficult under the best circumstances, is not required…." (*People v. Jackson* (1960) 183 Cal.App.2d 562, 568 (*Jackson*).) Further, reversal is not required "because of a failure of memory of one or more witnesses where there is substantial testimony in support of identity…." (*Ibid.*) "The uncertainty of recollection, qualification of identity and lack of positiveness in the testimony of" the witnesses are "matters going to the weight of the evidence and the credibility of witnesses," and are not

12

matters for the appellate court's consideration so long as the prosecution's theory is not "inherently incredible." (*Ibid.*)

B

"Tested by the foregoing rules[,] the evidence of the identification of [Dintelman] is sufficient to support the verdict of guilt on all counts." (*Jackson, supra*, 183 Cal.App.2d at p. 568.) As an initial matter, as the Attorney General highlights, there was overwhelming evidence showing the perpetrator of all of the charged robberies was the same man. With only slight variations, the witnesses for the five different robberies testified that the robber (1) was between five foot five inches and five foot seven inches tall; (2) was white; (3) had light colored eyes, either blue or green; (4) wore a surgical mask; and (5) handed the victim a manila envelope with writing that demanded large bills and no dye packs, or something similar, and in some cases made the same demand verbally. In addition, very similar modus operandi evidence was presented under Evidence Code section 1101, subdivision (b) from the victims in the failed robberies in Murrieta and Orange to further show that the same man committed all of the charged crimes. A clear and logical inference drawn by the jury from this testimony was that the bank robber on all five occasions was the same person.

As noted, Dintelman argues there was insufficient evidence to show he was the man that committed these crimes. We disagree. Strong circumstantial evidence and partial identification by each of the testifying victims and other witnesses supported the jury's determination that Dintelman was the robber. Each victim stated that Dintelman's appearance matched that of the robber. Specifically, Elizabeth stated the perpetrator was short, somewhere between five feet four inches and five feet seven inches, and he was the same size as Dintelman. Further, she testified the

13

size, shape, and color of Dintelman's eyes, the shape of his hands, and his skin tone all matched her recollection of the robber's features. Travis also testified that Dintelman was similar in height, body, and skin tone to the man that robbed him, and that a photograph of Dintelman showed that his hands, nose, and eyes were similar to the robber's features.

Likewise, Daisy testified that the robber had the same stature as Dintelman and that Dintelman's eyes looked "the same" as the robber's eyes—both in shape and wrinkles around the eyes. Unlike the other witnesses, Dakota was not asked to draw a direct comparison between Dintelman and the man that robbed her, but she nonetheless stated that the robber's eyes were blue-green and that he had distinctive wrinkles around his eyes. Similarly, Dakota's co-worker, Crystal, testified the man was not tall and had light-colored, not brown, eyes. Finally, Brittany testified the robber was about five foot five inches tall and that Dintelman appeared to be the same height. The partial identification testimony of these witnesses is strong evidence in support of the jury's determination that Dintelman was the perpetrator of this string of similarly-executed bank robberies.

Other circumstantial evidence collected in the investigation also supported the jury's verdicts. First, all of the victim witnesses testified the masks found in Dintelman's trash after his arrest were like the ones used by the robber. In addition, cell tower data placed Dintelman in the vicinity of the crimes committed on June 14, 19, and November 15, as well as two failed attempts on June 12 and 18. The events leading to Dintelman's arrest on November 20 also connected Dintelman as the masked robber. The truck photographed by David, who saw a man in a surgical mask get into and drive away in the truck, was rented by Dintelman only days earlier. Additionally, the boots and hoodie Dintelman was wearing when he was arrested appeared

14

to be the same worn by the robber during the November 15 incident. Evidence found in Dintelman's Dodge Ram truck also directly tied Dintelman to the crimes. Police investigators recovered from the truck a piece of a manila envelope and a hat that matched the one described by Elizabeth, Travis, Dakota, and Brittany during their testimony.[5]

It is not this court's role to reweigh the evidence in the manner Dintelman requests, focusing solely on small distinctions between the witnesses' testimony. An overwhelming amount of circumstantial and partial identification evidence supported the jury's verdict.

## II

Dintelman next contends the court violated his due process rights by instructing the jury pursuant to CALCRIM No. 315 to consider an eyewitness's certainty when evaluating an identification. The Attorney General responds that the issue was forfeited by Dintelman's trial counsel's failure to object to the instruction, and even if not forfeited, the claim lacks merit in light of the Supreme Court's recent decision in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). We agree with both of the Attorney General's arguments.

## A

The trial court provided the jury with CALCRIM No. 315, which is the standard jury instruction that lists 15 factors, including eyewitness certainty, to be considered in evaluating the truthfulness and accuracy of identification testimony. The instruction given stated, "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must

---

[5]    Dintelman relies on *People v. Robinson* (1964) 61 Cal.2d 373 to support his position that insufficient evidence supported the verdicts. This case, which held fingerprint evidence alone was insufficient to support a murder conviction, is inapposite to the facts here.

15

decide whether an eyewitness gave truthful and accurate testimony. [¶]  In evaluating identification testimony, consider the following questions…."  The instruction then lists 13 questions, including "How certain was the witness when he or she made an identification?"

"A claim of instructional error is reviewed de novo.  [Citation.]  An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law.  [Citation.]  In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution.  [Citations.]  The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'  [Citation.]"  (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

B

As an initial matter, we agree with the Attorney General that Dintelman forfeited his claim of instructional error because his trial counsel failed to object in the trial court.  (See *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 200 [finding forfeiture of same issue].)

Dintelman counters that even if his trial counsel forfeited the issue, we should consider the merits because it impacted his substantial rights.  However, the Supreme Court rejected the same argument in similar circumstances in *Lemcke*.  (*Lemcke, supra*, 11 Cal.5th at p. 669.)

The *Lemcke* court reasoned that "nothing in CALCRIM No. 315's instruction on witness certainty … operates to 'lower the prosecution's burden of proof.'  …  [T]he instruction does not direct the jury that 'certainty equals accuracy.'  [Citation.]  Nor does the instruction state that the jury must

16

presume an identification is accurate if the eyewitness has expressed certainty. [Citation.] Instead, the instruction merely lists the witness's level of certainty at the time of identification as one of 15 different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony. The instruction leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315. Indeed, even [the defendant] acknowledges that, on its face, the instruction is 'superficially neutral.'" (*Lemcke, supra*, 11 Cal.5th at p. 657.)

Further, *Lemcke* explained that any potentially misleading effect of the witness certainty factor in CALCRIM No. 315 is not present when a witness has expressed doubt, rather than confidence, about the accuracy of the identification. (*Lemcke, supra*, 11 Cal.5th at p. 669, fn. 19.) "The misleading effect we are concerned with here—that the jury is prompted to believe there is a strong correlation between certainty and accuracy despite empirical research showing just the opposite—is not present when a witness has expressed doubt regarding the identification." (*Ibid.*) Here, no witness fully identified Dintelman. Thus, none expressed certainty about their identification and the potentially misleading effect of the instruction was not present in this case. Under the binding authority of *Lemcke*, we conclude there was no violation of Dintelman's rights.

## III

On October 1, 2021, after briefing in this appeal was complete, the Governor signed Assembly Bill No. 518 into law. (Assem. Bill No. 518 (2021-2022 Reg. Sess.) The new law took effect January 1, 2022 and amended section 654 to give trial courts discretion to choose which sentence to impose

when a defendant has been convicted under two different Penal Code provisions for the same act. Prior to this change, section 654 required the trial court to impose the sentence under the provision of law carrying the longest term of punishment.

As a result, Dintelman requested the opportunity to file a supplemental brief addressing the change in the law. We granted the request and provided the Attorney General with the opportunity to respond. In his supplemental brief, Dintelman argues that remand for resentencing is warranted because the ameliorative change in the law applies retroactively to cases, like his, that are not yet final.

In response, the Attorney General concedes that changes to section 654 made by Assembly Bill No. 518 apply retroactively to this case. Further, the Attorney General asserts that remand is necessary here so the trial court can exercise its new discretion to determine whether to impose the sentences on the robbery convictions and stay the sentences on the burglary convictions, as it did initially, or to impose the sentences on the burglary convictions and stay the sentences on the robbery convictions.

We agree and accept the Attorney General's concessions. (See e.g., *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 309 [holding new laws giving judges discretion to ameliorate punishment, even if that discretion is ultimately exercised only in "some cases," should be applied retroactively to " ' "every case to which it constitutionally could apply" ' "].) Accordingly, Dintelman is entitled to a limited remand.

DISPOSITION

The cause is remanded to allow the superior court to exercise its discretion under section 654.  In all other respects, the judgment is affirmed.


McCONNELL, P. J.

WE CONCUR:


AARON, J.


DATO, J.